**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | |
|---|---|
| Paul T. Outland, | : |
| 186 Red Oak Court | : |
| Commercial Point, Ohio 43116 | : |
| | : CASE NO. **1:20-cv-00529** |
| PLAINTIFF, | : |
| | : JUDGE DAN AARON POLSTER |
| v. | : |
| | : |
| Elaine L. Chao, Secretary, et al. | : |
| U.S. Dept. of Transportation, | : COMPLAINT WITH JURY DEMAND |
| (Federal Aviation Administration | : ENDORSED HEREIN |
| 1200 New Jersey Ave. SE | : |
| Washington, DC 20590 | : |
| | : |
| DEFENDANT. | : |

## PRELIMINARY STATEMENT

1. This is an action brought subsequent to an administrative appeal before the Equal Employment Opportunity Commission ("EEOC"). The EEOC's Decision, affirming in part and reversing in part the Agency's final order, was rendered August 17, 2017 and delivered to Plaintiff on or about August 19, 2017.

2. This action was then originally filed in NORTHERN DISTRICT OF OHIO court on November 15, 2017.

3. However, on March 19, 2018, Judge Dan Polster remanded this case back to the EEOC for a final determination.

4. Final decision on this reconsideration was rendered by the EEOC on November 29, 2019. However, service was not completed on this matter in a timely manner.

5. This is an action brought pursuant to Sections 501 of the Rehabilitation Act of 1973, (Rehabilitation Act), as amended , 29 U.S.C. §791 et seq. to redress injuries sustained by Plaintiff Paul Outland (hereinafter "Plaintiff") as a result of Defendant U.S. Dept. of Transportation's (hereinafter "Defendant") discriminatory employment practices.

6. Jurisdiction is conferred on this court by 29 U.S.C. §791.  This court has supplemental jurisdiction over Plaintiff's State law claims pursuant to the doctrine of pendent jurisdiction.  Venue is proper in this Court pursuant to 28 U.S.C. §1402(a)(1).

7. During all relevant times herein, Plaintiff was a resident of the Northern District of Ohio.

8. Elaine Chao is the United States Secretary of Transportation.

9. The Federal Aviation Association is an agency of the Department of Transportation.

## FACTS

10. Plaintiff restates and incorporates the foregoing allegations as if fully rewritten herein.

11. Plaintiff served as a United States Marine from 1988 to 1992 and in the Navy from 1997 to 2007.

12. While it was his desire to make a career of the military, the disabilities he acquired from his active service forced him to abandon this aspiration.

13. Plaintiff's service in the military subjected him to front-line combat situations in Operation Desert Shield (Iraq and Turkey), Operation Provide Comfort (Iraq) and the global war on terrorism (Iraq) (2001 to 2007).

14. Due to his combat experiences, Plaintiff has been classified as "disabled" by the Department of Veterans Affairs since 2007.

15. The two predominate impairments Plaintiff suffers from are major depressive disorder (50%) and sleep apnea syndrome (50%) due to his combat experiences.

16. Plaintiff is "disabled" as that term is defined by the Rehabilitation Act and the Americans with Disabilities Act.

17. Among other things, Plaintiff's disabilities effect his ability to sleep and wake up in the morning.

18. Plaintiff's disabilities are exacerbated when he is under distress.

19. On September 19, 2011, Plaintiff was hired by Defendant, specifically, the Federal Aviation Association ("FAA") as an Airway Transportation System Specialist, FV-2101-F in Cleveland, Ohio.

20. Plaintiff was hired by the Defendant with the full knowledge that he was a disabled American military veteran.

21. Plaintiff was very transparent regarding his disabilities during his interview process. Not only did he reveal his various disabilities in his interviews, but he also faxed documentation from the Department of Veterans Affairs regarding his disabilities to the Defendant's Human Resource Department on September 13, 2011, which was six (6) days before the Defendant hired him.

22. Plaintiff had every reason to believe, and fully did believe, that the information relating to his disabilities had been passed onto his superiors in Cleveland, Ohio.

23. Therefore, the Defendant was clearly on notice regarding Plaintiff's disabilities and that he was covered by the Rehabilitation Act of 1973, as well as under Ohio's Fair Employment Practices Act R.C. Section 4112.

24. When Plaintiff relocated from Columbus, Ohio to Cleveland, Ohio to work for the Defendant on September 19, 2011, the Veteran's Administration ("V.A.") required Plaintiff to get his medication from the Cleveland V.A. rather than the Columbus V.A.

25. Unfortunately, the V.A. required Plaintiff to start all over in the process to get his medication from the Cleveland V.A. rather than from the Columbus V.A.

26. As a result, Plaintiff ran out of his medication in mid-October 2011.

27. Plaintiff began to experience sleep disruptions and started having problems waking in time for work.

28. Once his medications had worked its way out of his body, he was late to work on October 31, November 2, 15 and 16, 2011.

29. His final incident of tardiness occurred on December 21, 2011.

30. At the same time Plaintiff started being late to work, he also went into a deep depression.

31. This depression was spurred primarily by the recent death of a loved one and the fact that his step-father had been diagnosed with terminal cancer.

32. These events caused his nightmares of being in combat in Iraq to reoccur.

33. After he received his fourth warning for being tardy on November 16, 2011, Plaintiff went to go see his direct supervisor, Mr. Allan Borling (hereinafter "Borling"), on November 17, 2011 to discuss his disabilities and his tardiness.

34. At this meeting, Plaintiff explained to Borling that his disabilities rendered him disabled due to his anxiety and sleep apnea.

35. These disabilities caused him great sleep problems from time to time. Plaintiff explained that his depression and sleep apnea could be very disruptive to his sleep schedule.

36. Plaintiff was surprised when he learned that Borling was unaware of his disabilities since Plaintiff had provided the Defendant with all of his disability paperwork upon hire.

37. He naturally thought all of this information was passed onto Mr. Borling.

38. At this meeting on November 17, 2011, Plaintiff also explained to Borling that he was still trying to get his medication supply arranged through the Cleveland V.A. due to his relocation from Columbus, Ohio.

39. Plaintiff then asked if his shift schedule could be changed to work the afternoon shift, from 1:00 pm to 11:00 pm. Borling refused.

40. Plaintiff also asked if he could be granted some "leeway" on his tardiness until his medication could be arranged properly and his sleep schedule was under better control. Borling refused.

41. Plaintiff then asked if he could be permitted to arrive at work at 8:00 am instead of the traditional 7:00 am starting time. Borling again refused, claiming, *"... that it would not be fair to the other employees if I let you start at 8AM."*

42. This was the only reason given to Plaintiff as to why his request was refused.

43. Borling then made a couple of offers of accommodation to Plaintiff.

44. Borling offered to change Plaintiff's schedule from a four-day workweek, in which he currently worked 10-hour shifts from 7:00 am to 5:30 pm, to a five-day workweek, which would run from 7:00 am to 3:30 pm.

45. However, since Plaintiff's conditions made it difficult for him to sleep and get up in the morning, this suggestion simply did not address his early start time, which was Plaintiff's limitation.

46. Another alternative accommodation offered by Borling was to allow Plaintiff the opportunity to use his Paid Time Off (PTO) and arrive at work one hour later than usual, at 8:00 am, rather than at 7:00 am.

47. Plaintiff's primary concern with accepting this offer of accommodation was that he would run out of PTO. To use one hour from his PTO account every day would simply exhaust his time off, and once that happened, he would have to once again begin arriving at his scheduled 7:00 am start time.

48. This could easily result in Plaintiff being late once again, which would mean the end of his job with the Defendant.

49. Moreover, Plaintiff realized that if he was sick for even one day, again, he would not have enough PTO to make this suggested accommodation work.

50. As a result, the suggested accommodation was not going to be effective, even if he was fortunate and was not sick throughout this period of time. He would simply run out of PTO. It was not an adequate or effective alternative.

51. No further discussion regarding any other possible accommodations for Plaintiff were ever discussed. Likewise, no further discussion or investigation occurred that might have addressed Plaintiff's concern that he would run out of PTO if he accepted Borling's offer to let him use one hour of PTO each day.

52. Therefore, since the Defendant refused to grant any of Plaintiff's requests for accommodations, and since it failed to offer any adequate accommodations of its own, Plaintiff was on his own to deal with his disabilities.

53. In order to avoid any type of tardiness problems until his medication situation was resolved through the Cleveland V.A., Plaintiff began arriving at work between 11:00 pm and 1:00 am and slept at his desk or on a couch in order to make sure he was not late to work the next day.

54. This was the extent Plaintiff was willing to sacrifice in order to meet the requirements Mr. Borling placed upon him.

55. Clearly, Plaintiff was willing to go to extreme lengths to meet these requirements, in spite of his disabilities and lack of medication.

56. However, rather than recognizing the incredible effort exhibited by Plaintiff and his desire to be successful in this position, when Mr. Borling discovered what Plaintiff was doing, he told Plaintiff that this was not acceptable. Plaintiff therefore had to stop this practice.

57. One month later, on December 19, 2011, the Defendant gave Plaintiff a letter that was intended to document the conversation of November 17, 2011.

58. The letter asked Plaintiff if he was requesting an accommodation.

59. The letter then went onto question his ability to do his job, it questioned the medications Plaintiff was taking and it questioned whether Plaintiff could perform a "safety sensitive" job while taking these medications.

60. When presenting him with the letter, Borling told Plaintiff that requesting an accommodation for his disability would only cause him problems with the Defendant.

61. Borling discouraged Plaintiff from mentioning his disabilities telling him that it would be better for him to not mention his disabilities or his need for accommodations. Otherwise, his future with the Defendant could be jeopardized.

62. Plaintiff was not familiar with term "accommodation" as it is used in the context of the Rehabilitation Act, the Americans with Disabilities Act, and Ohio law.

63. In response to the question about accommodation, Plaintiff stated he was just asking for help.

64. After the conversation with Borling and after learning of his step-father's diagnosis at or about the same time, Plaintiff had trouble sleeping on the nights of December 19 and 20, 2011.

65. Plaintiff was late for work on December 21, 2011.

66. Plaintiff was then terminated on December 22, 2011 for being late to work five times in three months.

67. No other reason for discipline or termination was ever mentioned.

68. Plaintiff pursued his right to file inter-agency EEO charges and an appeal to the EEOC.

## COUNT I
## Disability Discrimination (Termination)
## In Violation of Section 501 of the Rehabilitation Act

69. Plaintiff restates and incorporates the foregoing allegations as if fully rewritten herein.

70. At all times relevant herein, Plaintiff was disabled and able to perform the essential functions of his position with reasonable accommodation.

71. Defendant was on notice of Plaintiff's disability before he was hired and was specifically on notice that Plaintiff suffered with a sleep disorder.

72. But for the unlawful denial of his right to accommodation, Plaintiff would not have been subject to disciplinary action for arriving late for work.

73. By terminating Plaintiff under the circumstances described above, Defendant unlawfully discriminated against Plaintiff because of his disability.

74. Plaintiff has been damaged by Defendant's discriminatory termination of his employment such that he is entitled to damages therefore, including back pay, front pay, damages for emotional distress and attorney's fees.

Respectfully submitted,

ADAMS, LIMING LLC

*/s/Sharon Cason-Adams*_____
SHARON CASON-ADAMS (0067550)
Agee, Clymer, Mitchell & Portman, L.L.C.
scasonadams@ageeclymer.com
**226 NORTH 5TH STREET, UNIT 510**
Columbus, Ohio 43215
(614) 221-3318-telephone
Attorney for Plaintiff

and

*/s/Scott Warrick*
Scott Warrick (#0066420)
1147 Matterhorn Drive
Reynoldsburg, Ohio 43068
Telephone:  614-738-8317
Attorney for Plaintiff

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues.

*/s/Sharon Cason-Adams*_____
SHARON CASON-ADAMS (0067550)

10

Elaine L. Chao, Secretary
U.S. Dept. of Transportation,
Federal Aviation Administration
1200 New Jersey Ave. SE
Washington, DC 20590


The United States Attorney
Northern District of Ohio
801 W. Superior Ave., Suite 400
Cleveland, OH 44113


William Barr, U.S. Attorney Genera
U.S. Attorney General's Office
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001


Federal Aviation Administration
800 Independence Ave SW
Washington, DC 20591

DEFENDANTS